IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| ARTISAN AND TRUCKERS CASUALTY COMPANY,<br><br>        Plaintiff and Counter-Defendant,<br>   v.<br><br>TMT DEVELOPMENT CO., LLC, D. PARK CORPORATION d/b/a HAYDEN MEADOWS, MATTHEW CADY d/b/a CORNERSTONE SECURITY GROUP, JEFFREY JAMES d/b/a CORNERSTONE SECURITY GROUP, TJ LATHROM d/b/a CORNERSTONE SECURITY GROUP, KARI NELSON, PETER GLAZER, as the personal representative on behalf of ESTATE OF FREDDY NELSON JR., and LOGAN GIMBEL,<br><br>        Defendants and Counter-Claimants. | Case No.: 3:23-cv-00014-AN<br><br>OPINION AND ORDER |

        Plaintiff Artisan and Truckers Casualty Company ("Artisan") brought this declaratory judgment action in 2023 against defendants TMT Development Company ("TMT"); D. Park Corporation ("D. Park"); Matthew Cady, Jeffrey James, and TJ Lathrom (doing business as "Cornerstone" and, together, the "Cornerstone defendants"); Kari Nelson, individually, and Kiono Nelson[1], as the personal representative of the estate of Freddy Nelson Jr. (together, the "Nelson defendants"); Tiffany Wolf; and Logan Gimbel. Plaintiff seeks a declaration that it does not have a duty to defend or indemnify the Cornerstone defendants in two underlying state course actions: *Estate of Freddy Nelson Jr. v. TMT Development Co. LLC et al.*, case number 21CV40742 in the Multnomah County Circuit Court (the "Nelson Lawsuit"), and *Wolf v. D. Park Corporation et al.*, case number 22CV31097 in the Multnomah County Circuit Court (the "Wolf Lawsuit").

---

[1] Peter Glazer was substituted for Kiono Nelson as the personal representative of the Estate of Freddy Nelson Jr. on February 21, 2025. *See* Order, ECF [98].

Plaintiff filed a motion for partial summary judgment and defendants have responded. After reviewing the parties' thorough papers, the Court finds that oral argument will not help resolve this matter. Local R. 7-1(d). For the reasons stated herein, plaintiff's motion for summary judgment is GRANTED. The parties are directed to file a joint status report within thirty days of this Opinion and Order identifying what issues in the case remain to be adjudicated and proposing a case schedule for doing so.

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of showing that there is no genuine issue of material fact. *Rivera v. Philip Morris, Inc.*, 395 F.3d 1142, 1146 (9th Cir. 2005). Material facts are those which might affect the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Materiality is determined using substantive law. *Id.* A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

When a moving party demonstrates the absence of a genuine dispute as to any material fact, the nonmoving party that bears the burden at trial must show in response that there is evidence creating a genuine dispute as to any material fact. *Rivera*, 395 F.3d at 1146 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986)). The court must "view the facts in the light most favorable to the nonmoving party" except to the extent that the nonmoving party's testimony is "'blatantly contradicted'" by record evidence, especially video evidence. *Hughes v. Rodriguez*, 31 F.4th 1211, 1218 (9th Cir. 2022) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)).

## BACKGROUND

A.     **Factual Background**

    1.     *Underlying Incident*

D. Park and TMT hired Cornerstone to provide armed security guards at the Delta Park Center at 1160 North Hayden Meadows Drive in Portland, Oregon. Decl. of Michael J. Farnell in Supp. of

Defs. Resp. to Mot. for Summ. J. ("Farnell Decl."), Ex. 11, ECF [91-11] at 1-3. One of the security guards employed by Cornerstone to patrol the Delta Park Center was Logan Gimble"". Farnell Decl., Ex. 3, ECF [91-3]. On May 29, 2021, Kari Nelson ("Ms. Nelson") and Freddy Nelson Jr. ("Mr. Nelson") were parked at the Delta Park Center in front of a Lowe's Home Improvement store. Decl. of Eric J. Neal in Supp. of Mot. for Summ. J. ("Neal Decl."), Ex. 22, ECF [82-22].[2] Around 6:40 PM, Gimbel parked his Cornerstone-marked car perpendicular to the Nelsons' truck, got out of his car, and approached the Nelsons' driver-side window. *Id.* After Mr. Nelson closed and locked the driver-side door, Gimble released pepper spray into the Nelson's truck through an open rear window. *Id.* Gimble then walked in front of the Nelsons' truck, toward his car, and, as the Nelsons started to drive away, Gimble drew his pistol and fired several shots at Mr. Nelson, killing him. *Id.*

Ms. Nelson, individually, and Kiono Nelson, on behalf of the Estate of Freddy Nelson Jr., filed the Nelson Lawsuit alleging wrongful death, negligence, negligent infliction of emotional distress, and false arrest/imprisonment against Gimble and, under a theory of vicarious liability, the Cornerstone defendants. Declaration of Margaret E. Schroeder in Supp. of Cornerstone Def. Mot. for Partial Summ. J. ("Schroeder Decl."), Ex. 3, ECF [63-3] ("Nelson Lawsuit Compl.") ¶¶ 38-92.[3] They additionally brought a claim for negligent hiring against the Cornerstone defendants. *Id.* On February 11, 2022, Cornerstone tendered the Nelson Lawsuit to plaintiff for defense, which plaintiff accepted. *See* Schroeder Decl., Ex. 2, ECF [63-2].

Certain pertinent issues were adjudicated before the Nelson Lawsuit went to trial. First, parallel to the civil proceedings, the State of Oregon issued a five-count criminal indictment against Gimble.

---

[2] The record includes three videos: Gimble's body camera footage, Neal Decl., Ex. 22, ECF 82-22; his dashboard camera footage, Farnell Decl., Ex. 13, ECF [91-13]; and Lowe's surveillance footage, Farnell Decl., Ex. 14, ECF [91-14]. The Court has reviewed each and they show substantially the same series of undisputed events.

[3] Rather than laying out the facts, plaintiff generally incorporates by reference the factual background from prior summary judgment briefing. *See* Plf. Mot. for Summ. J. (" Plf. Mot."), ECF [81], at 3. "It is not this Court's task 'to scour the record in search of'" relevant facts. *Lavelle-Hayden v. Legacy Health*, 744 F. Supp. 3d 1135, 1148 (D. Or. 2024) (quoting *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996)). Nonetheless, the Court has referenced evidence in the record from prior summary judgment briefing to substantiate uncontested background facts.

Farnell Decl., Ex. 1, ECF [91-1]. And, on May 8, 2023, Gimble was found guilty of murder in the second degree, unlawful use of a weapon, and two counts of unlawful use of mace in the second degree in Multnomah County Circuit Court. Farnell Decl., Ex. 10, ECF [91-10], at 171-72. Second, prior to trial, the Multnomah County Circuit Court granted the Nelsons' motion for partial summary judgment in the Nelson Lawsuit, "finding that Gimbel was acting in the course and scope of his employment and Cornerstone is therefore vicariously liable for the compensatory and punitive damages resulting from Gimbel's tortious acts." Farnell Decl., Ex. 2, ECF [91-2], at 2. Finally, following the circuit court's summary judgment decision, Cornerstone stipulated to the fact that "it is liable for the actions of its employees, including Logan Gimbel and . . . through the actions of one or more of its employees, it was negligent." Farnell Decl., Ex. 3, ECF [91-3], at 2.

Going into trial, it was therefore already established that Gimbel had recklessly pepper-sprayed the Nelsons, that he had recklessly caused the death of Mr. Nelson, and that Cornerstone was liable in negligence for these actions. Because the Nelsons had, shortly before trial, voluntarily dismissed their claim that Gimble had falsely imprisoned them with his car, *see* Def. Resp. to Plf. Mot. for Summ. J. ("Defs. Resp."), ECF [90], at 15 n.5, the only questions left to the jury were the amount of damages and the apportionment of liability, Neal Decl., Ex. 2, ECF [82-2], at 11. The Nelson Lawsuit was tried before a jury in September 2024. Neal Decl. ¶¶ 5-22. The jury concluded that the negligence of TMT, Cornerstone, Gimbel, Lowe's, and Mr. Nelson caused injury to Mr. Nelson and Ms. Nelson, and that Cornerstone and Gimbel had been reckless. Neal Decl., Ex. 2 at 6-7. The jury awarded $10 million in noneconomic damages and $625,000 in punitive damages to each Mr. Nelson and Ms. Nelson. *Id.* at 2-3, 8-9.

    2.    *The Insurance Policy*

Plaintiff issued a commercial auto insurance policy to Cornerstone (the "Policy"), with a combined single liability limit of $1,000,000 that was in effect at the time of the incident. Neal Decl., Ex. 3, ECF [82-3], at 3. The Policy lists Gimbel as a rated driver. *Id.* at 4. The relevant provisions of the Policy provide:

4

> "COMMERCIAL AUTO POLICY
> . . .
>
> "GENERAL DEFINITIONS
>
> "'Accident' means a sudden, unexpected and unintended event, or a continuous or repeated exposure to that event, that causes bodily injury or property damage.
> . . .
>
> "PART I—LIABILITY TO OTHERS
> . . .
>
> "[Plaintiff] will pay damages, other than punitive or exemplary damages, for bodily injury, property damage, and covered pollution cost or expense for which an insured becomes legally responsible because of an accident arising out of the ownership, maintenance or use of [the] insured auto.
> . . .
>
> "Expected or Intended Injury[:] Bodily Injury or property damage either expected or caused intentionally by or at the direction of the insured.
> . . .
>
> "Coverage under this Part I, including our duty to defend, does not apply to punitive or exemplary damages."

Neal Decl., Ex. 3 at 12-13, 17, 68-69 (emphases omitted).

**B.    Procedural Background**

        Plaintiff filed the operative complaint on May 31, 2023. 1st Ammend. Complaint, ECF [36]. The Cornerstone defendants filed an answer with counterclaims, alleging breach of contract arising out of Artisan's duty to defend Cornerstone in the underlying lawsuits and seeking attorney fees incurred for defending against plaintiff's claim for declaratory relief. Answer & Countercls., ECF [40]. The Cornerstone defendants allege that Artisan breached its duty to defend in the underlying lawsuits, that Cornerstone had subsequently been forced to hire defense counsel in the Nelson Lawsuit, and that Artisan had failed to pay for the costs incurred as defense fees. *Id.* ¶¶ 12-20.

        Last year, the parties cross-moved for summary judgment and to stay certain aspects of the litigation. *See* ECF [46], [49], [51], [56], [62]. The Court granted defendants' motion for summary judgment on plaintiff's duty to defend against the Nelson Lawsuit; granted defendants' motion to stay plaintiff's claim with regard to the Wolf Lawsuit and with respect to plaintiff's duty to indemnify in the

5

Nelson Lawsuit, because such a decision would be premature before the underlying litigation was resolved; and denied the Cornerstone defendants' motion for summary judgment on their attorney fees counterclaim. *See* Sept. 30, 2024 Order & Opinion ("Order"), ECF [75]. Shortly after, the parties informed the Court that the Wolf Lawsuit had been dismissed for want of prosecution and that they no longer intended to litigate any issues related to the Wolf Lawsuit. Status Rep., ECF [76].

With respect to plaintiff's duty to defend, the Court observed that the Nelson Lawsuit concerned two sets of allegations: (1) "those relating to the manner in which Gimbel approached and interacted with the Nelsons before pepper spraying the Nelsons and shooting Freddy Nelson, Jr.," and (2) "those relating to Gimbel's alleged false arrest and imprisonment of the Nelsons." Order at 10. The Court held that "[t]he acts of discharging mace in the Nelsons' vehicle, then raising the pistol and shooting at Freddy Nelson, Jr., are wholly dissociated and independent of the use of the insured vehicle. The damages resulting from this alleged conduct do not arise out of the ownership, maintenance, or use of an insured auto." *Id.* at 10-11. On the other hand, the Court held that the allegations relating to Gimbel's false imprisonment of the Nelsons "are more closely related to the use of the vehicle. . . To the extent that the Nelsons plead damages resulting from the false arrest and imprisonment, those arise out of the use of the insured vehicle." *Id.* at 11. Ultimately, because an "insurer has a duty to defend if the complaint provides *any basis* for which the insurer provides coverage," the allegations related to false imprisonment were sufficient to trigger plaintiff's duty to defend. *Ledford v. Gutoski*, 319 Or. 397, 400, 877 P.2d 80 (1994) (emphasis in original); *see* Order at 14-15.

On November 11, 2024, plaintiff filed the present motion for summary judgment, asking the Court to find that plaintiff "does not own any indemnity obligations to Cornerstone for any of the damages awarded by the jury" in the Nelson Lawsuit. Plf. Mot. 3. Defendants responded on February 10, 2025. Defs. Resp. Plaintiff filed a reply in support of its motion on February 24, 2025. Plf. Reply, ECF [97].

## DISCUSSION

**A.     Oregon's Duty to Indemnify**

Oregon law applies to the contract at issue in this case. *See Alexander Mfg. v. Ill. Union Ins. Co.*, 560 F.3d 984, 986 (9th Cir. 2009). Under Oregon law, "the insured . . . has the burden to prove coverage while the insurer ([plaintiff]) has the burden to prove an exclusion from coverage." *ZRZ Realty Co. v. Beneficial Fire & Cas. Ins. Co.*, 349 Or. 117, 127, 241 P.3d 710 (2010), *as modified on reconsideration*, 349 Or. 657, 249 P.3d 111 (2011). Importantly, the duty to indemnify is independent of an insurer's duty to defend. *W. Hills Dev. Co. v. Chartis Claims, Inc. Oregon Auto. Ins. Co.*, 360 Or. 650, 652, 385 P.3d 1053 (2016). "[T]here are occasions when an insurer has a duty to defend, but if trial ends with a verdict that is not covered by the policy, then the insurer has no duty to indemnify." *Id.* at 652-53 (emphasis omitted). This is because the duty to defend is based on "allegations in the initial complaint," but the duty to indemnify is based on "the facts proved at trial on which liability is established." *Ledford*, 319 Or. at 403; *see Mt. Hawley Ins. Co. v. Waterside, LLC*, Case No. 3:21-cv-00502-JR. 2022 WL 1750349, at *3 (D. Or. Jan. 11, 2022) ("[T]he duty to defend is triggered by the bare allegations in the pleading and it is only necessary to demonstrate that coverage possibly exists whereas the duty to indemnify requires proof of facts demonstrating a right to coverage.").

In Oregon, the interpretation of an insurance contract is a question of law. *Holloway v. Republic Indem. Co. of Am.*, 341 Or. 642, 649, 147 P.3d 329 (2006) (citing *Hoffman Constr. Co. v. Fred S. James & Co.*, 313 Or. 464, 469, 836 P.2d 703 (1992)). The court's primary goal "is to ascertain the intention of the parties, as reflected in the terms and conditions of the policy." *Twigg v. Admiral Ins. Co.*, 373 Or. 445, 456, 568 P.3d 156 (2025) (citing *Hoffman Constr. Co.*, 313 Or. at 469). As such, the Court's "interpretive inquiry 'does not begin . . . with case law,'" instead, it "'begins with an examination of the words of the applicable [contract] provisions.'" *Id.* at 456 n.6 (omission in original) (quoting *Interstate Fire v. Archdiocese of Portland*, 318 Or. 110, 117, 864 P.2d 346 (1993)).

The Oregon Supreme Court recently reiterated its longstanding framework for interpreting disputed terms in insurance contracts. *See id.* at 457. First, if a term has a "plain meaning" such that it is "'susceptible to only one plausible interpretation'" the court must apply that meaning. *Id.* (quoting *Groshong v. Mutual of Enumclaw Ins. Co.*, 329 Or. 303, 308, 985 P.2d 1284 (1999)). Consulting dictionary definitions

7

of a term may "suggest[] a plain or ordinary meaning that would render either party's proposed interpretation implausible." *Id.* at 459. "[P]rior [court] opinions also can provide guidance as to a policy term's plain or ordinary meaning." *Id.* at 460. Second, if the parties advance more than one "plausible interpretation" of the term, the court should "consider the 'particular context' in which the term is used" in the policy. *Id.* at 457 (quoting *Groshong*, 329 Or. at 312). The "particular context" of a term "include[s] the language immediately surrounding the disputed term." *Id.* at 467. Next, if the particular context fails to resolve the ambiguity, the court can "look to the 'broader context of the policy as a whole.'" *Id.* at 457 (quoting *Groshong*, 329 Or. at 312). Finally, "if multiple interpretations remain reasonable," then the court should "'resolve any doubt as to the meaning of [the] term against the insurer.'" *Id.* (quoting *Gonzales v. Farmers Ins. Co.*, 345 Or. 382, 387, 196 P.3d 1 (2008)) (alteration in original). Which is to say that if the insured offers a "plausible and reasonable interpretation of the insurance policy," in light of the plain meaning, particular context, and broader context of term, then "[the insured's] interpretation governs regardless of whether the insurer offers a different interpretation that is also plausible and reasonable." *Alkemade v. Quanta Indem. Co.*, 687 Fed. Appx. 649, 651 (9th Cir. 2017) (citing *Hoffman Constr. Co.*, 313 Or. at 470).

**B.     The Relevant Policy Language**

The question of whether plaintiff owes Cornerstone and Gimbel a duty to indemnify against the Nelson Lawsuit verdict must "'begin[] with an examination of the words of the applicable [Policy] provisions.'" *Twigg*, 373 Or. at 456 n.6 (quoting *Interstate Fire v. Archdiocese of Portland*, 318 Or. 110, 117, 864 P.2d 346 (1993)). Plaintiff issued a "Commercial Auto Insurance" policy to Cornerstone in which it agreed to "pay damages, other than punitive or exemplary damages, for bodily injury . . . because of an accident arising out of the ownership, maintenance or use of [an] insured auto." Neal Decl., Ex. 3 at 17 (emphases omitted). The parties' dispute focuses on the meaning of "arising out of" and whether the conduct for which the insureds were found liable in the Nelson Lawsuit amounted to an "accident arising out of" the use of Gimbel's security vehicle.

First, because the Policy does not define "arising out of," the Court must look for the plain meaning of the term in dictionary definitions and prior court opinions. *See Twigg*, 373 Or. at 459-60. The

8

Oregon Supreme Court "often consults *Webster's Third New International Dictionary* (*Webster's*)" to find the plain meaning of a policy term. *Id.* at 458. Webster's relevant entry defines "arise" as follows: "**4a**: to originate from a specified source . . . [or] **b**: to come into being . . . [or] **c**: to become operative. . . ." *Webster's*, 117 (unabridged ed. 1993). Although Webster's "originate from" definition is applicable, considerable ambiguity remains with respect to how much of a causal connection is demanded by the language of the Policy.

The Oregon Supreme Court has also had occasion to consider the ordinary meaning of "arising out of" in insurance policies. Defendants point to *Oakridge Community Ambulance Service, Inc. v. U.S. Fidelity & Guaranty Co.*, in which the Oregon Supreme Court observed that:

> "[a]lthough ownership, maintenance, or use of the automobile need not be the direct and efficient cause of the injury sustained, liability does not extend to results distinctly remote, though within the line of causation. The words 'arising out of' when used in such a provision are of broader significance than the words 'caused by', **and are ordinarily understood to mean originating from, incident to, or having connection with the use of the vehicle**."

278 Or. 21, 25, 563 P.2d 164 (1977) (quoting 7 Appleman, Insurance Law and Practice 144 § 4317 (1967)) (emphasis added). The *Oakridge* court explained that "there exists a continuum of causal connection between the injury or death and the 'ownership, maintenance or use of the automobile.'" *Id.* At one end of the spectrum, where an "insured's ambulance while being negligently driven hits and injures a party," coverage would exist "as a matter of law" because of the direct connection between the injury and the coverage condition. *Id.* At the other end of the spectrum, in a situation where "a potential customer, upon entering insured's place of business to order an ambulance to take his sick mother to the hospital, trips over a negligently arranged rug and breaks his leg," coverage would not exist because "the causal connection would be too attenuated to afford coverage." *Id.* at 25-26.

Defendants also rely on *Carrigan v. State Farm Mutual Automobile Insurance Co.*, 326 Or. 97, 949 P.2d 705 (1997), which interprets statutory language requiring every motor vehicle insurance policy to provide benefits for certain injuries "resulting . . . from the use, occupancy or maintenance of any

9

motor vehicle." *Id.* at 100 (quoting ORS 742.520(2)).[4] There, the court considered "two plausible interpretations that flow" from the dictionary definition of "resulting": "The first would require that the gunshot injury be the direct consequence of the use of the vehicle. . . . A second, equally plausible, interpretation would permit coverage if the gunshot injury is the consequence or effect of any use of the vehicle." *Id.* at 102. Finding two plausible interpretations, the court abided by statutory direction to liberally construe the Insurance Code in favor of the insured and applied the second definition to conclude that an insured who was injured outside his vehicle in the course of a carjacking had injuries "resulting from" the use of that vehicle. *Id.* at 104-05.

The Oregon Courts of Appeal have also weighed in on the meaning of "arising out of" and "resulting from." In *Jordan by Jordan v. Lee*, the court analyzed whether an accidental firearm discharge inside a vehicle "ar[ose] out of the ownership, maintenance, or use of the owned automobile." 76 Or. App. 472, 474-75, 709 P.2d 752 (1985). Applying *Oakridge*, the court in *Jordan* reasoned that "arising out of" policy language does not require the vehicle to be "the direct or legal cause of the injury" but "neither can the injury be unrelated to the use of the vehicle." *Id.* at 475. It then considered the facts at hand: the owner of an insured trailer stored a loaded handgun in the trailer's upper bunk. *Id.* at 474. The next day, two children were put to nap in the trailer. *Id.* One of the children then found the firearm and accidentally shot the other in the leg. *Id.* Although the court concluded that storing a gun and putting children to nap were each, separately, "uses" of the trailer that were covered by the policy, "[t]he relationship between" the two uses "and the accident was fortuitous. Those uses played no role in causing the accident." *Id.* at 475.

---

[4] Although the *Carrigan* court was interpreting "resulting . . . from" rather than "arising out of," at least one appellate court has concluded that, in the context of Oregon insurance law, the two terms should be interpreted the same. *See De Zafra v. Farmers Ins. Co.*, 270 Or. App. 77, 84, 346 P.3d 652 (2015) ("We cannot draw a meaningful distinction between the operative phrase in the UM statute—"arising out of"—and the operative phrase in the PIP statute— "resulting from"—which *Carrigan* construed."). Indeed, *Carrigan* observed that the ordinary meaning of "resulting" includes "'*arise* as a consequence.'" 326 Or. at 102 (emphasis added) (quoting *Webster's*, 1937). Plaintiff does not dispute the applicability of *Carrigan*, and the Court concludes that it is good evidence of how the Oregon Supreme Court would interpret the Policy language. *See Kaiser v. Cascade Cap., LLC*, 989 F.3d 1127, 1131–32 (9th Cir. 2021) ("Absent controlling precedent from the state supreme court, a federal court must 'predict how the highest state court would decide the [state law] issue using intermediate appellate court decisions, decisions from other jurisdictions, statutes, treatises, and restatements as guidance.'" (alteration in original) (quoting *Judd v. Weinstein*, 967 F.3d 952, 955-56 (9th Cir. 2020)).

Because the accident "was the result of . . . an act independent of the trailer's use" the gunshot injury was not "arising out of" the ownership or use of the vehicle; instead, it was "caused by some act wholly disassociated from and independent of the vehicle's use." *Id.* The court therefore affirmed judgment in favor of the insurer. *Id.* at 474, 476.

More recently, in *Takata v. State Farm Mutual Automobile Insurance Co.*, the Oregon Court of Appeals considered whether an insured who was hit by a bicycle while walking from her car had sustained an injury that "resulted from the use of her vehicle." 217 Or. App. 454, 456-57, 176 P.3d 415 (2008) (cleaned up). Thoroughly analyzing *Carrigan*, the court concluded that, in situations where a person is injured while not in and using a vehicle, "resulting from" language must be interpreted to provide coverage "if the injury 'is the consequence or effect of any use of the vehicle.'" *Id.* (quoting *Carrigan*, 326 Or. at 102). Although the court agreed with the insured that her use of her car—to drive home and to store items—were "but for" causes of her injuries, it held that "the nature of plaintiff's use of her car . . . had no consequential relationship to the injury—producing force, *viz.* the speeding cyclist." *Id.* at 462. Accordingly, the court of appeals reversed the trial court's denial of summary judgment to the insurer. *Id.*[5]

Together, *Oakridge* and its progeny suggest that the ordinary meaning of "arising out of" denotes a causal connection that is tighter than simple but-for causation, but looser than proximate causation, which comports with the dictionary definition of "arising" as "originating from." Thus, for an

---

[5] Cases considering intentional shootings are mixed. *Compare Worldwide Underwriters Ins. Co. v. Jackson,* 121 Or. App. 292, 295, 855 P.2d 166 (1993) (concluding that, as a matter of law, "arising out of" policy language does not encompass events where the insured vehicle merely "facilitated the shooting and escape" and was "not the 'direct cause' of the shooting"), *with De Zafra*, 270 Or. App. at 86 (calling *Jackson* into question after *Carrigan* and reversing a grant of summary judgment where the insured could put forth evidence showing the "vehicle was used [by a shooter] to approach with surprise and maximize the likelihood of injury," because such conduct would have sufficiently narrow "'temporal and spatial distance' between the vehicle use and the injury" to put it within the meaning of "arising out of" and, therefore, be covered (quoting *Carrigan*, 326 Or. at 105), *and Est. of Mseer v. Allstate Ins. Co.*, No. 3:22-cv-1954-SI, 2024 WL 3598998, at *4 (D. Or. July 30, 2024) (concluding that there was a genuine dispute of material fact as to whether insured's injuries were "related to" the use of an insured vehicle because, when viewed in the light most favorable to insured, the evidence could establish that "at all relevant times, the assailants were physically close to the uninsured vehicles" and "the assailants used the uninsured vehicle to approach with surprise to maximize the likelihood of injury"). *De Zafra* and *Estate of Mseer* are distinguishable from the facts here because neither party contends, and the undisputed evidence does not show, that Gimble used his patrol car to maximize the likelihood of injury.

injury to "arise out" of the use or ownership of an insured vehicle does not require the vehicle to be a direct cause of the injury, but it must have some consequential relationship. This suggests that defendants' apparent interpretation of the term—that virtually any "connection" between the Nelsons' injury and the "ownership, maintenance, or use" of Gimbel's security vehicle would establish coverage, Defs. Resp. 25—is implausible.

Even if defendants' interpretation is plausible, an admittedly low bar, the context of the term in the Policy renders defendants' interpretation unreasonable. *See Twigg*, 373 Or. at 457 (noting that the court should consider the "particular context" and "broader context of the policy as a whole" to determine if offered interpretations are reasonable). Although the particular context sheds little light on the meaning of "arising out of," the broader context of the Policy highlights how unreasonable defendants' interpretation is. Importantly, defendants are not seeking coverage from a broad form general liability policy, which typically cover any accident that occurs in the course of an insured's business. *See, e.g., Twigg*, 373 Or. at 447. Instead, they seek indemnity under a "COMMERCIAL AUTO POLICY," with a scope of coverage limited only to those accidents arising out of the use of insured vehicles. Neal Decl., Ex. 3 at 12. As noted in *Oakridge*, an ordinary "person of reasonable intelligence" does not understand an auto insurance policy to "extend to results distinctly remote" from the ownership and operation of the insured auto. 278 Or. at 25 (quotations omitted). In cases where "the insured's sole business is the operation of the insured vehicle[s]," no reasonable person bargaining for an auto insurance policy would expect it to cover "almost any activity" connected to that business. *Id.* at 26. But that is what defendants' interpretation of "arising out of" would seem to require here—because Cornerstone's business consisted of providing "Uniformed On-Site Security Officer w/ Marked Patrol Vehicle," Farnell Decl., Ex. 11 at 1, defendants' broad reading of the Policy would render virtually every act of negligence by Cornerstone's employees to be "incident to" their use of their patrol vehicles and, consequentially, covered by the Policy. Therefore, although defendants are correct that the main "question that matters is whether the interpretation proffered by the Insureds and the Nelsons is reasonable," Defs. Resp. at 25, their proffered interpretation is *not* reasonable and does not control.

Instead, the Court adopts a plain, common sense meaning of "arises out of": the Nelsons' injuries "arise[] out of" the ownership or use of Gimbel's patrol vehicle if they "originate from" such ownership or use, *i.e.*, if their injuries are the consequence of Cornerstone and Gimbel's ownership or use of the vehicle and are not caused by some other act independent of the patrol car's use. *See Takata*, 217 Or. App. at 462.

C.     **The Undisputed Facts**

With this interpretation of the Policy language, the remaining question is whether plaintiff has established "that there is no genuine dispute as to any material fact" and is, therefore, "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The parties disagree about the appropriate source of facts to consider, but this dispute is largely a distraction because even under defendants' more expansive understanding of the universe of facts, plaintiff still prevails.

Plaintiff contends that "the duty to indemnify is determined by reviewing the evidence submitted in the underlying liability trial." Reply at 7 (cleaned up); *see Fountaincourt Homeowners' Ass'n*, 360 Or. 341, 357, 380 P.3d 916 ("What the insured is legally obligated to pay as damages can be determined only by reference to the underlying action, which determined the insured's legal obligation to pay damages."). In plaintiff's view, because one "will not find a single reference [in the Nelson Lawsuit trial] to the Cornerstone auto being involved in this loss," the Court must conclude that there is no evidence of the Nelsons' injuries arising from the use of Gimbel's patrol vehicle. Plf. Mot. at 3. Defendants counter that the Court would only be limited to the Nelson Lawsuit trial record "if the judgment in the underlying liability case necessarily answer[ed] the specific coverage question in dispute." Defs. Resp. at 11 (citing *Fountaincourt Homeowners' Ass'n*, 360 Or. at 361-65). Here, where "the Nelsons were not required to prove that the security vehicle, pepper spray, or a firearm were the cause of harm," especially in light of Gimbel's earlier criminal conviction and Cornerstone's stipulation to liability, defendants argue that the Court is not limited to the underlying record. *Id.* at 14 (emphases omitted).

Defendants have the better argument. Although it is true that "the facts proved at [the underlying] trial on which liability is established may give rise to a duty to indemnify if the insured's

13

conduct is covered," the Court is not strictly limited to the jury verdict in the underlying trial if the underlying claims do not necessarily address the coverage question at issue. *Ledford*, 319 Or. at 403; *see id.* at 403-04 (relying on an affidavit in the summary judgment record to resolve a fact not adjudicated in the underlying proceeding); *Fountaincourt Homeowners' Ass'n*, 360 Or. at 362-65 (affirming the trial court's resolution of whether the events in the underlying litigation occurred during the policy period, even thought that question was not before the underlying jury); *see also Twigg*, 373 Or. at 474 (holding that the question of whether the insured "unreasonably [and tortiously] created a foreseeable risk of harm" may be adjudicated in the insurance litigation where the underlying litigation involved only contract claims arising out of the same events). Therefore, it is appropriate for the Court to consider the entire record presented by the parties, including Gimbel's criminal trial, the pre-trial summary judgment and stipulation of fact, and the videos and other evidence introduced in both trials.

But just because the Court may consider more evidence does not mean there is a genuine dispute of material fact. The parties actually dispute few, if any, facts. There is no dispute among the parties that Cornerstone was contracted to supply armed security in marked patrol cars and hired Gimbel to patrol the Delta Park Center in a car that was insured by plaintiff, Farnell Decl., Exs. 3, 11; that Gimbel initiated a confrontation with the Nelsons by parking his patrol car perpendicular to their truck, preventing them from leaving their parking spot to their right, Neal Decl., Ex. 22; and that Gimbel got out of his patrol car, walked up to the Nelsons' truck, pepper sprayed them through a cracked window, and fired four bullets into Mr. Nelson when he attempted to drive his truck away, *id.* These facts were introduced at trial in both Gimbel's criminal prosecution and the underlying Nelson Lawsuit, in the form of both testimony and video evidence. *See, e.g.*, Farnell Decl., Ex. 9, ECF [91-9], at 69-93 (Gimbel's testimony in the criminal trial); Neal Decl., Ex. 12, ECF [82-12], at 32-48 (James Holman's testimony in the Nelson Lawsuit trial); Neal Decl., Ex. 22 (bodycam footage from Gimbel's vest entered into evidence in the Nelson Lawsuit trial); Farnell Decl., Exs. 13-14 (additional video footage of the events introduced into evidence in Gimbel's criminal trial and the Nelson Lawsuit trial).

Defendants attempt to create a dispute of fact through the testimony of proffered experts.

14

*See* Defs. Resp. at 39-41. But defendants' consultants do not raise any material facts that are in dispute.

Much of the testimony of James Holman ("Mr. Holman"), is speculation as to Gimbel's plans, motives, and intentions. *See, e.g.*, Decl. of James Holman in Supp. Defs. Resp. ("Holman decl."), ECF [93], ¶ 16 ("Gimbel's use of his security vehicle *was deliberate*. His decision to park his marked security vehicle in such a manner that blocked the victim's northbound exit *was a strategic move*, commonly used in the security industry, *intended to* gain control of the situation while ensuring his own safety." (emphasis added)); *id.* ¶ 18 ("After being confronted by Gimbel, Mr. Nelson first moved his vehicle forward and slightly to his right, causing Gimbel to retreat toward his security vehicle, perhaps seeking to use it as cover."); *see also* Neal Decl., Ex. 16, at 45 (underlying trial court sustaining an objection to Mr. Holman's testimony as to Gimbel's mental state). Opinion testimony about Gimbel's intent, motive, or state of mind cannot be presented in a form that would be admissible in evidence and, therefore, cannot create a dispute of fact. *See Siring v. Oregon State Bd. of Higher Educ. ex rel. E. Oregon Univ.*, 927 F. Supp. 2d 1069, 1077 (D. Or. 2013) ("Courts routinely exclude as impermissible expert testimony as to intent, motive, or state of mind.") (collecting cases); *see also* Fed. R. Civ. P. 56(c)(2). The remainder of Mr. Holman's declaration constitutes conjecture about hypothetical situations that were not adjudicated in the underly Nelson Lawsuit. *See* Holman Decl. ¶ 20 ("Had [Gimbel] not positioned his vehicle as he did, effectively blocking the Nelsons' path and utilizing the vehicle as a shield, the dynamics of the situation could have unfolded in a completely different manner."). Musings about events that did not occur and were not before the jury in the Nelson Lawsuit are not material to plaintiff's duty to indemnify.

The declaration of Nancy Grugle ("Dr. Grugle") is similarly unhelpful to defendants. Her declaration seeks to support a conclusion that that "Gimbel's use of the security vehicle to block a clear path of exit from the parking space created an unreasonably dangerous condition that prevented Nelson from safely exiting the parking space." Declaration of Nancy Grugle in Supp. Defs. Resp., ECF [92], ¶ 7. Even if that conclusion is in dispute, whether Gimbel created an unreasonably dangerous condition is not a material fact because it was not what the insureds were held liable for in the Nelson Lawsuit. Nothing in the jury instructions indicates that the jury was addressing the question of any dangerous conditions. *See*

15

Neal Decl., Ex. 1, ECF [82-1]. Nor does the summary judgment order or Cornerstone's stipulation in the Nelson Lawsuit establish that it created a dangerous condition. Farnell Decl., Exs. 2-3. Nor is this fact relevant to Gimbel's conviction for murder in the second degree, unlawful use of a weapon, and two counts of unlawful use of mace in the second degree in Multnomah County Circuit Court. *See* Farnell Decl., Ex. 1 & Ex. 10 at 171-72. Given that Dr. Grugle did not testify in either of the preceding trials, it is not surprising that her testimony is irrelevant to the question of what was adjudicated in those trials.

Because the parties agree as to the material facts, and the record evidence is undisputed, the only question remaining is whether those facts establish as a matter of law that plaintiff has no duty to indemnify defendants. They do.

Plaintiff is obligated to indemnify defendants against "damages . . . for bodily injury" for which defendants "become[] legally responsible because of an accident arising out of the ownership, maintenance or use of [an] insured auto." Neal Decl., Ex. 3 at 17 (emphases omitted). As discussed, *supra*, that means plaintiff must indemnify for accidents that are the consequence of Cornerstone and Gimbel's ownership or use of the vehicle and are not caused by some act independent of the vehicle's use. *Jordan*, 76 Or. App. at 475.

Based on all of the evidence in the record, including both the criminal and civil proceedings, a reasonable jury could not conclude that the Nelson Lawsuit verdict on the Nelsons' wrongful death, negligence, and negligent infliction of emotional distress claims were related to Cornerstone or Gimbel's use or ownership of the insured auto. The undisputed evidence shows that the acts for which Cornerstone and Gimbel were held liable in the Nelson Lawsuit—Gimbel's discharging pepper spray in the Nelsons' truck and shooting and killing Mr. Nelson—were not the consequence of insureds' use or ownership of the insured patrol car; instead, they were caused by Gimbel's actions wholly independent of the patrol car's use. Unlike the assailants in *De Zafra* and *Estate of Mseer*, there is no evidence that Gimbel used the patrol car to "maximize the likelihood injury." *See De Zafra*, 270 Or. App. at 86; *Est. of* Mseer, at *4. Instead, much like the insured in *Takata*, who was struck by a cyclist after parking her car nearby, the insured patrol car here "had no consequential relationship" to Gimbel's decision to pepper spray and

16

shoot the Nelsons after parking the patrol car nearby. 217 Or. App. at 462.

## CONCLUSION

    For the foregoing reasons, plaintiff Artisan and Truckers Casualty Company's Motion for Summary Judgment, ECF [81], is GRANTED. In accordance with the parties' joint status report, ECF [87], the parties are directed to confer and file a joint status report within thirty days of this Opinion and Order identifying what, if any, issues in the case remain to be adjudicated and, if necessary, proposing an updated case schedule.

IT IS SO ORDERED.

   DATED this 29th day of September, 2025.

               _____
               Adrienne Nelson
               United States District Judge